NOT DESIGNATED FOR PUBLICATION

No. 128,901

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JUSTIN TERRY ST. JOHN,
*Appellant*.


MEMORANDUM OPINION

Appeal from McPherson District Court; JOHN B. KLENDA, judge. Submitted without oral argument. Opinion filed July 24, 2026. Affirmed.

*Grace E. Tran*, of Kansas Appellate Defender Office, for appellant.

*Ethan C. Zipf-Sigler*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.


Before WARNER, C.J., ISHERWOOD and HURST, JJ.


PER CURIAM: Justin Terry St. John appeals his convictions for aggravated assault, criminal threat, and domestic battery. He argues the district court erred in denying his motion for a mistrial after a juror disclosed mid-trial that the juror had taught one of St. John's children and held a parent-teacher conference with St. John and the child's mother. He also argues the denial of that motion and the prosecutor's statements during closing argument denied him a fair trial. We affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

In March 2022, the State charged St. John with one count each of aggravated assault, criminal threat, and domestic battery against Jane (a pseudonym), St. John's longtime domestic partner and the mother to their three children.

The case proceeded to a jury trial, where Jane testified about two incidents that occurred in February 2022. Jane stated that on February 18, St. John had pushed her into a dresser, causing her to fall and leaving a bruise. The next day began with a physical altercation between St. John and Jane. As the day went on, St. John began drinking vodka. He grew increasingly agitated after the children went to bed and told Jane that "he wanted to cut [her] head open to see what made [her] tick inside" and that "he could make [her] disappear and nobody would know." Their son overheard the statements and became frightened. Jane testified she was also afraid of St. John's threats.

Jane eventually went outside for a short while before trying to go back inside. Finding the door locked, she rang the doorbell. St. John answered the door holding a loaded firearm and said, "[W]here are they at, I'm ready for them." Jane believed St. John was referring to her mother and brothers.

Although Jane feared St. John would kill her, she tried to enter the house through another door. Finding that door locked, Jane walked about a quarter mile to a nearby creek and called her mother, explaining what had occurred. Jane's mother then called the McPherson County Sheriff's Office.

Because children and a firearm were involved, the responding officers requested a special response team. The response team contacted St. John, who—after approximately an hour and a half of communications—exited the house unarmed. Officers recovered a

2

Ruger AR-15 rifle with a 40-round magazine from the house, which Jane later identified as the weapon St. John had been holding when he answered the door.

The jury convicted St. John on all counts, and the district court sentenced him to 13 months' imprisonment. St. John appeals. We provide additional details as they become relevant to our analysis.

DISCUSSION

St. John raises two arguments on appeal. He contends that the district court abused its discretion and deprived him of a fair trial when it denied his motion for a mistrial, finding that a juror who taught St. John's child could not be impartial in hearing the evidence. And he argues that the prosecutor made an impermissible "golden rule" argument by inappropriately encouraging jurors to place themselves in Jane's position and consider whether they would have similarly felt scared during the interaction. St. John claims that these alleged errors individually and collectively denied him a fair trial.

1. *The district court did not abuse its discretion in denying St. John's motion for mistrial based on the juror's earlier interactions with St. John and his family.*

St. John first argues that the district court erred when it denied his motion for a mistrial when one of the jurors recalled during the trial that she had previously interacted with St. John and his family.

This argument requires a bit more context. At St. John's trial, during the State's case-in-chief, a juror realized she had taught one of St. John and Jane's children. The juror informed the district court of this connection and disclosed that she had interacted with both St. John and Jane during a parent-teacher conference. During this interaction, St. John told the juror that she looked "familiar." The district court ordered St. John to stop talking, but the juror replied, "Yeah, because I was thinking the same thing. I

3

thought, well, he looked familiar, but I did not put the connection together until I heard [the child's] name." The court questioned the juror, who indicated she could still be fair and impartial despite being "very fond of" the child. The juror also confirmed her relationship with the child had not exposed her to any facts of the case; the child never commented on their home life or parents, and the parent-teacher conference had been the sole interaction she had with St. John and Jane. The juror emphasized that "[the child's] just very, very quiet, very reserved."

St. John moved for a mistrial based on the disclosure. In a chambers conference, St. John argued a mistrial was necessary because the information revealed—that the juror had taught one of the children and had a parent-teacher interaction with St. John and Jane—should have been disclosed during voir dire. The district court denied the motion, pointing to the juror's explanation that the child "was very quiet, reserved, never really talked about the family" and that there was nothing about the relationship that would have impacted her ability to sit as a fair and impartial juror.

On appeal, St. John argues that allowing the juror to remain at the trial after her disclosure that she had taught one of his children deprived him of a fair trial. He contends the district court abused its discretion because it was "unreasonable" to believe a juror could be both fond of his child and impartial given the facts of this case. We are unpersuaded.

The Sixth Amendment to the United States Constitution guarantees a right to a jury trial, and the Fourteenth Amendment guarantees due process. When read together, these amendments "guarantee criminal defendants the right to a fair and impartial jury." *State v. Jenkins*, 308 Kan. 545, 557, 422 P.3d 72 (2018) (citing *Morgan v. Illinois*, 504 U.S. 719, 727-28, 112 S. Ct. 2222, 119 L. Ed. 2d 492 [1992]). The conduct of jurors may "impair this right and result in a fundamental failure in the trial." *Jenkins*, 308 Kan. at 557.

K.S.A. 22-3423(1)(c) states that a district court may order a mistrial if "prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." The statute creates a two-step test, first requiring the district court to determine if there was some fundamental failure with the proceeding. If a failure occurs, then the district court assesses whether it is possible to continue without an injustice—that is, "if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action." *State v. Sean*, 306 Kan. 963, 987, 399 P.3d 168 (2017). If not, the court should order a mistrial. 306 Kan. at 987. A court reaches the second step of this analysis only when it finds a fundamental failure occurred. 306 Kan. at 988.

Whether an event constitutes a fundamental failure turns on "whether it affected the outcome of the proceedings." *State v. Logsdon*, 304 Kan. 3, 27, 371 P.3d 836 (2016). The defendant bears the burden of proving that they were substantially prejudiced. *State v. Navarro*, 272 Kan. 573, 582, 35 P.3d 802 (2001).

An appellate court will only set aside a district court's denial of a mistrial when the district court has abused its discretion—when the decision was based on a legal or factual error or was otherwise arbitrary, fanciful, or unreasonable. *State v. Gonzalez-Sandoval*, 309 Kan. 113, 126-27, 431 P.3d 850 (2018); *Sean*, 306 Kan. at 987-88. The party asserting the claim bears the burden of showing an abuse of discretion occurred. *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018).

Most of our caselaw discussing the question of juror interactions involve jurors taking some action contrary to the court's admonitions—communicating with witnesses, parties, or court staff, or undertaking an unauthorized factual investigation. See *Jenkins*, 308 Kan. at 557. But juror misconduct is not limited to these circumstances. Misconduct

5

can also occur when a juror deceives the court about their "familiarity with other jurors, witnesses, the parties, or the facts of the case." 308 Kan. at 557-58.

But as the district court found here, the juror in St. John's case did not engage in any deceptive conduct. The juror did not recognize her connection to St. John during voir dire, but she informed the court as soon as she became aware of the connection after hearing the child's name. Though the juror disclosed her interactions with St. John, Jane, and the child after the trial began, she alerted the bailiff as soon as she realized the connection. See *State v. Rhodes*, 219 Kan. 281, 283, 546 P.2d 1396 (1976) (finding no misconduct when juror failed to disclose during voir dire that she was a customer of the victim's because she did not know the victim by name and thus did not realize that she knew him until the trial was underway). In other words, the court found that allowing the juror to remain did not create a fundamental failure in the judicial process. We agree.

This court has upheld a district court's denial of a motion for mistrial in similar circumstances, with arguably closer relational ties. For example, in *State v. Swindler*, No. 118,484, 2019 WL 1746952, at *5 (Kan. App. 2019) (unpublished opinion), we found that a district court need not declare a mistrial based solely on a juror's peripheral relationship with the defendant. In that case, the defendant's brother and a juror's daughter had a child together, meaning Swindler was the uncle of the juror's grandchild. The juror did not recognize Swindler and merely noticed that the defendant had the same last name as his grandchild's father. On appeal, this court found no abuse of discretion in denying the motion for a mistrial, as the district court had conducted an inquiry and nothing in the record contradicted the juror's statements that he could remain impartial despite this attenuated familial relationship with the defendant. 2019 WL 1746952, at *5.

Similarly, the district court in this case assessed the juror's credibility and concluded the juror could remain impartial, despite her previous interactions. St. John argues that this decision was inherently unreasonable and should be overturned on

6

appeal. But our review of the record shows that the district court and the parties each questioned the juror's ability to remain fair and impartial, and the juror offered an assurance of fairness each time. The district court was well positioned to assess the juror's credibility—an assessment to which we defer, as an appellate court cannot assess credibility based on a transcript. See *State v. Whitesell*, 270 Kan. 259, 286-87, 13 P.3d 887 (2000) (appellate courts give deference to district court's assessment of the juror's credibility).

The district court did not err when it denied St. John's motion for a mistrial.

2. *The prosecutor's "golden rule" argument at closing did not affect the outcome of St. John's trial.*

St. John next argues that the prosecutor impermissibly encouraged jurors to place themselves in Jane's position and consider whether they would have similarly felt scared, contending that the prosecutor made an improper "golden rule" argument.

Appellate courts use a two-step process to review claims of prosecutorial error. We first determine whether the prosecutor erred by making arguments that fell outside the "wide latitude" afforded prosecutors in arguing the State's case. *State v. Brown*, 316 Kan. 154, 164, 513 P.3d 1207 (2022); *State v. Sherman*, 305 Kan. 88, 109-10, 378 P.3d 1060 (2016). This latitude permits prosecutors to comment on the evidence and draw reasonable inferences, but it does not extend to misstating the law, urging conviction on an improper legal theory, or "'inflam[ing] the passions or prejudices of the jury.'" *State v. Thomas*, 311 Kan. 905, 910, 468 P.3d 323 (2020); *State v. Z.M.*, 319 Kan. 297, 317, 555 P.3d 190 (2024). We consider the context in which the challenged statement was made—rather than analyzing the statement in isolation—when considering whether the prosecutor's statements fell outside of the wide latitude afforded to prosecutors to argue their case. *Brown*, 316 Kan. at 164. If we find the prosecutor erred, then the State must

convince us beyond a reasonable doubt that the erroneous argument did not affect the jury's verdict. *Sherman*, 305 Kan. at 109.

A "golden rule" argument describes "the suggestion by counsel that jurors should place themselves in the position of a party, a victim, or the victim's family members." *State v. Lowery*, 308 Kan. 1183, Syl. ¶ 5, 427 P.3d 865 (2018). Our Supreme Court has consistently cautioned against using such arguments in criminal trials, "because it encourages the jury to decide the case based on personal interest or bias rather than neutrality." 308 Kan. 1183, Syl. ¶ 5.

Our review of the record shows that the prosecutor used this rhetorical tactic during closing argument, addressing the evidence relating to the criminal-threat charge and asking the jury to view the evidence through Jane's lens:

> "That one's important because he says I'm threatening to kill you and your family and leave no witnesses. He comes to the door and he carries an assault rifle. What does [Jane] and the witnesses tell us that [Jane] said when he opened the door? Comes out with that assault rifle, the assault rifle that [Police] Chief Kaufman tells us that when he locates it and when he seizes it into evidence is loaded with bullets in the magazine. And he, while holding the assault rifle, sees [Jane] out on the porch and he tells [Jane], where are they, I'm ready for them. Is that threatening? Is that scary? Would that alarm you if someone's holding a firearm, especially if they had been drinking, they had been aggressive to you all night? If that individual had battered you or had battered a reasonable person that same day, is it reasonable that they would be scared?"

In pursuing this line of argument, the prosecutor began within the range of argument allowed to attorneys—discussing the evidence presented through witness testimony. But we agree with St. John that midway through the prosecutor's discussion, his rhetoric veered outside the latitude afforded attorneys during closing argument. In particular, the prosecutor asked the jurors to consider how *they* would *feel* when placed in

a similar situation—encouraging them to rely on their own personal feelings rather than deciding the case based on the evidence presented at trial. In other words, the prosecutor asked the jurors to consider whether *they* would be frightened by St. John's interactions instead of focusing on whether the evidence showed that Jane was afraid during her encounter. While the overall context of the prosecutor's statements blurs the line between argument based on the evidence and impermissible reliance on the jurors' passions, rendering our decision a difficult one, we find that these later comments were error.

But although the prosecutor erred, the State has demonstrated that this error did not affect the outcome of St. John's trial. Our review of the record shows that there was overwhelming evidence showing that Jane was afraid of St. John's conduct on the night of the offense. Jane, Jane's mother, and a law enforcement officer each testified that Jane was scared. The record further reflects that St. John battered Jane the previous day, made life-threatening comments toward her, and answered the door holding an assault rifle. Moreover, the response team had to communicate with St. John for over an hour before he surrendered, suggesting St. John's conduct was so extreme that a reasonable person would have been afraid under the circumstances. We find there is no reasonable possibility that the prosecutor's erroneous statements contributed to the jury's verdict.

In his brief, St. John argues that even if the two challenges he has raised do not individually require a new trial, their cumulative effect calls into question the fairness of his proceedings. But St. John has pointed to only one error in his proceedings—the prosecutor's argument during closing—and we have concluded that argument did not affect the outcome of his trial. Thus, his claim of cumulative error is unavailing. See *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).

No trial is perfect. Kansas courts have long held that a defendant is not entitled to a perfect trial, but to a *fair* one. *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013).

Our review shows that St. John received a fair trial in this case. We affirm his convictions.

Affirmed.